Minors, people in the state of Illinois, Petitioner Athalee, and Barnes N. respond to the comments. Argument number 10, I'll be responding to the comment. Mr. Andrew J. Butler, argument number 10. Mr. Athalee, case 7-H-2.    Mr. Athalee, case 7-H-2. Ms. Isabella, you may proceed. Mr. Vela, I have an initial question to ask. Did you ever file a motion to correct your brief in this case? I did not. Well, the face of your brief says you're representing the mother. And it doesn't appear that you are. Brief in argument of appellant respondent mother. On the first page of your brief, where you request oral argument. The cover. Okay, I'm looking at it. No, you're doing the certificate, aren't you? Yes, Your Honor, the next page is... Yes, Your Honor, that's typo, I apologize. Well, it's a little confusing when you start to read the record, and you start to read your information, and it says you're representing the mother. I think that's something that needs to be looked at. Yes, Your Honor. Thank you. Really, the only argument, the only issue I'd like to point the court's attention to was that the father, Darius M., was only allowed to see his children one time. I think that paints any kind of argument of unfitness against him. He had one visit that was cut off, they say, because the children were disruptive. But if you look at the trial record, the children were disruptive in their foster homes. They had to be moved multiple times. They had to be separated. So I don't think that's a legitimate reason for Mr. Darius to not have been able to see his children. I think... And phone or whatever, they have it set up over there. When I get out, I'm going to whoop you or something to that effect? I think that the caseworker did have that in her notes. I think it depends on if we don't have context. Obviously, we don't have video of that. Is that him saying, trying to get them to calm down, which the caseworker seemed like he was unable to do? I know a parent is allowed to punish their child reasonably. He doesn't say he was going to hit them. I guess it depends on what the court considers was meant by that. Well, I think there was something like that in the national football with Adrian Peterson. He talked about hitting his children with a switch. I mean, I don't know what a switch is. My mother never used one. Maybe she should have. But I'm going to whoop you. Even if he's trying to calm the children down, this is not the way you conduct a visit, is it? Well, again, Your Honor, we don't know that it was just that statement. We don't know what he meant by that. We don't know if it was, again, that it sounded like the children were being disrupted. And the caseworker also was unable to keep them focused. Neither was father. But, again, they said that was the reason they stopped the visit. And the implication is the visits. The implication is being around father makes them disruptive, where the record shows that's not the case, is that they were disruptive at every place that they were at. And they were, in fact, separated. I mean, there could be also an argument that he was in custody for possibly beating up their mother. And then their mother, the day that they were taken, their mother was there possibly high on something with a knife to her wrist in front of the children. That's right. That could make children disruptive generally. That could as well. But I would argue that the trial record shows that even after they were removed from their parents and unable to see Mr. Darius for over a year, they were still being disruptive. I think the trial record shows that one of the children was removed from their placement within a few months before the hearing put back.  I thought that your argument concerning that issue was that it really wasn't in the best interest of the children to be in foster care because, look, what's happening, they're still disruptive. I thought that's what your argument about the disruptive children related to. That's part of it, but I think, obviously, the unfinished portion, the record shows that Darius did not do a whole lot. I mean, he was incarcerated. There's things you can do. But I would argue that the fact that, again, he got one visit and the reason to stop him from seeing his children was that they were, and the implication was that him seeing them caused them to be disruptive, which the record, I think, shows that it just, for whatever reason, that the children were difficult to manage, even for three different foster homes. So that, I think, goes to all the issues of unfitness. As far as best interest, yes, there was, the children had to be moved to different foster homes. They're separated. There's no guarantee that, I think the testimony was that the sibling visits were being conducted by the department, but that the foster parents were, there's no guarantee they were going to continue that, that they had a bond with their maternal grandmother that would necessarily continue. And Mr. Darius was also sent to the, I would imagine he's released right now, so determining at that time I don't think is in the best interest of the children. In the fact that they're separated, I don't think it's in the best interest of the children. What about your argument that he really didn't know what his obligations were or he didn't authorize some consents or something? What was that particular argument? Well, I think he had, there was testimony initially that it was confusing, and the casework that testified, I guess, wasn't the original casework, but some consents. I think originally he said he didn't get the consents. Then later on he admitted he got them but didn't understand them. But I think you argued that he couldn't have complied because he didn't have them. That is not consistent with the record, is it, counsel? No, Your Honor. He did initially say he didn't get them, but then he corrected himself, and he admitted he later got them. But you didn't correct yourself, did you? I did not, Your Honor. All right. And that's, I mean, again, Your Honor, my whole argument rests on the fact that he wasn't able to see his children, and as far as my center is concerned, the children were separated, and it looks like their placements have not been taken care of. All right. Mr. Villa, who represented the children in the trial court proceedings? I think there were two different guardian titles. Was one of them in any way related to you? Yes. And to your office? Yes, Your Honor. You share the same office. You're not in different firms? No. Okay. Did you see any problems with that? Well, and maybe it's a, I do family law, and I don't know if there's a corresponding statute in the Juvenile Court Act, but in family law, they can appoint a JAL, a child rep, or an attorney for the child. My understanding of the JAL, and this is family law, is that they're appointed to tell the court what's in the message to the child, not necessarily the child's attorney, but they'll just do whatever the child says. These children really couldn't say much, could they? No. But, I mean, I think regardless of age, I think they're just appointed guardian title, which is different, I think. And that's all they do in juvenile court, correct? I've looked at a lot of these records, and I don't see one or more of those persons appointed in the juvenile court, at least in your county. Well, there can be, and I'm not certain what they do, there's a CASA, of course, playing a special advocate. I'm not certain if that's their role, is to be their child's attorney or not. Well, but certainly the interest of a guardian ad litem with these three children, and your interest with the father, are not on the same plane, are they? Well, I mean, they're not adverse litigants. The whole idea of the exercise is reunification. I know it doesn't happen often, unfortunately, or often enough, but I think that's the idea of the exercise. And again, at the trial level, yes, the two GALs had a different opinion than Darius's trial counsel. I guess that was, I don't know if that's considered a client. I understand if it's a client, I can't represent it. But a client with an adverse interest, which obviously the child can't give consent. Well, when you were first assigned this case, did you give any thought to this issue when you started reading the record and saw a name that you were familiar with? I did. And again, because it was GAL, I didn't think, I think I'm wrong. I don't know if their case law says I'm wrong, or I looked at the professional rules. I looked at the Juvenile Court Act, but maybe I missed the part about GALs. I looked at the Family Court Act, or the Dissolution of Marriage Act, that delineates a different chamber of attorney in the GAL. What is the role of the GAL in juvenile court? My understanding is to tell the court that they believe it's the best interest of the children. And where do they get that information? From reading reports. I mean, sometimes they'll talk to the children. Sometimes they don't. I don't know. I've never been to GAL or juvenile court, I'm assuming. Depending on the children's age, they'll meet with the children. If the children are not of age where you meet with them, then they start reporting. And so if the GAL says the best interest is not reunification, does that put you at odds with representing the father on the field? If the child is considered a client of the GAL, if that's an attorney-client relationship rather than just an attorney appointed to tell the court what's in the best interest of the children. Again, in the Dissolution of Marriage Act, there's a separate, there's a child rep, there's an attorney, and there's a GAL, which is the GAL is not the same as the child rep. But maybe it's different in juvenile court. I went to the Juvenile Court Act. I didn't see a difference or a definition that says the GAL is their client. Mr. Vella, you filed less than a page of argument relating to the failure of the state to prove by a preponderance of the evidence that the best interests of the minor children were that Darius Neville's parental rights not be terminated. And you mentioned the location of the children and some two criteria, and you mentioned some problems that the children have. But nowhere do you discuss how the reality of the placements, when compared to being placed with the father, would result in the best interests of the children. In other words, when you attempt to establish that it's in the best interests of the children to be with the father, it would seem to me that you should make some mention of what the father's abilities and proclivities are, and you haven't said a single thing about what the father could have done, let alone could have done better insofar as custody, relationships, whatever, with the children. Do you understand that when you make an argument regarding the concept that the evidence doesn't support the proposition that you set forth what the facts are and then you set forth hypothetically or otherwise why your proposition is correct, meaning you should be probably, in my opinion, at least this is the way I would do it, I would state what the father supposedly could do or would do, and hopefully if in the past he did those things, you could use that to corroborate your suppositions. But there's nothing in here that suggests that we're supposed to make a comparison between A and nothing. And I don't know how you can say that A is bad when you haven't compared it against anything. You know, websites that sell things have compares. You hit the little checkbox, and the point is if you don't check anything, you're not comparing anything. And if you don't compare anything, there's no way that you're going to convince me that whatever it was that you're suggesting is better isn't better because you haven't set forth what it is. Do you see the problem? I do, Your Honor. I guess I would say that I don't. The man has been incarcerated for quite a length of time, hasn't he? Yes, sir. Did you even mention that? I believe we did. You didn't mention that it was in the best interest that because he's incarcerated that they be kept someplace else until he's out of jail or out of prison. You haven't suggested he be placed with, say, a familial member other than a foster parent who's already agreed to take the child on behalf of the defendant. Have you stated that the defendant is willing to expend monies in the support of the children in a third-party placement? You basically haven't suggested anything as to what your client would or could do. And until you even attempt that, there's no way for us to compare whatever you wrote and make a determination that it's against the manifest way of the evidence or possibly an abuse of discretion. Yes, Your Honor. I would just say there was limited evidence as to what various statements he would do. And maybe I'm understanding it wrong, but I think my understanding is that what they're deciding is whether or not it's in the best interest of the children that his rights are terminated, not necessarily that when it's terminated it's over to him. I mean, it doesn't have to be one or the other. Well, you didn't even say that, though, did you, that the children could be placed closer than 30 to 35 miles away from each other and they could be placed in with? You did mention today a maternal, I think, grandparent. But do we have anything in the record that indicates she could or would take the children? Well, no. I didn't say that she would take them. I said that there is in the record, in the trial court record, that the children were bonds to the maternal grandmother and that there were sibling visits that wouldn't necessarily occur. That's, I mean, again, I don't, maybe, again, I'm not suggesting that they would, a trial court would have just turned the children over to various, but I don't believe it's in their best interests that his rights be terminated at this time because it's not like, I don't, in my opinion, they're not in the same situation as it is in their three different foster care situations in three different counties. But what's the alternative to where, to what the court did? Not pursue a termination of Ronald Wright's and give Mr. Darius a chance to, I guess, foresee his children placed. And where would they be? I'm not suggesting that they'd be removed from where they're at, but once you terminate his rights, then that's, there's no other alternative. That's why I don't, I understand that the children need permanence, but that this wasn't a case where the children were in a placement together for two years. I mean, one of them was removed from their placement within a few months of the hearing and then placed back. So I think it wasn't the proper time, that's my argument, that it wasn't the proper time to terminate his Ronald Wrights. Thank you, sir. You'll have an opportunity to make rebuttal. Thank you. Good afternoon, Your Honors. Good afternoon.  On behalf of the state. You may proceed. Okay. There are six different grounds of unfitness here that were alleged and the court found to be proven. Any of the briefing concerns that have been raised would, on behalf of the Respondents' Council, would not in any way affect the overwhelming nature of the evidence that was, in fact, presented to the court when the findings were made. Well, one of the issues that seemed to be an umbrella of all of them, with maybe the exception of depravity, is that, well, he just didn't really know what he had to do or he didn't have any opportunity to do it. Correct. But, in fact, that isn't necessarily true, is it? No, that actually is not true because if you look at the service plan from December of 2018, the worker said that she, in fact, mailed an introduction letter, an integrated assessment to complete, and releases, which would be what would allow them to talk to the Department of Corrections about him. And that was mailed November 6 of 2018. The Respondent did later admit that he had received those at one of the court dates and, in fact, said, When I first got it, I didn't understand, which he could have followed up on. He was still in custody of Winnebago at that time, correct? I'm trying to remember when his actual move date is, but I know that he said when he first got them he didn't understand them, and then he went to maximum security for an altercation with the corrections officer. Okay, so that was in Hill. It was in Hill. I believe he was already moved at that point, yes. And so in terms of that goes really to all of these things because obviously he was given the chance to correct things, to rehabilitate himself so that he was no longer the depraved. Counsel and the Respondent has admitted that the presumption of depravity was, in fact, raised by his three bounties,  and there is nothing in this record to rebut that presumption. But that also goes to his failure to maintain a reasonable degree of interest and concern and responsibility. Obviously, it's not responsible to get yourself incarcerated by committing these acts after your children have been born, and any one of the three, interest, concern, or responsibility, is sufficient to find under that ground. We have not only his own conduct leading him to be incarcerated, but then we also have his conduct impacting his ability or willingness or something to complete these services that are required to attempt to reunify with his children. There's also the two periods alleged as to both efforts and progress, and it's the same situation, which is his efforts were insufficient because if he didn't understand the documents that were provided to him, he certainly could have reached out. Without releases, they can't talk to the Department of Corrections, and, in fact, putting himself into maximal security kept him from also being able to do these things. In terms of progress, we need to have a demonstrable movement towards reunification, and we certainly don't have that. There's no way that these children could be returned to him at the time of the hearing in the near future, and as of today, we have no further information that he's still incarcerated because his outdate is not passed. As to the best interest findings, the court made a specific factual finding that the minors were stable in their current placement and they were not alienated from each other. And so that is a factual finding that has not been proven to be against the manifest weight of the evidence. These are children that actually do have very serious mental health and disability issues. I did not outline them completely in the brief because initials are not. I was hesitant, but if the court would like to look at page 527 to 528 of the Commonwealth record, it outlines the exact disabilities and things that are going on with these children. They are very difficult children. Very early on, they were young, and they were in the jail, and they were running and spitting and hitting each other. Obviously, the DCFS made the determination that that was not in the best interest and then added to, as your owner said, the threat to whoop the children. That's what he says at a supervised visit in the jail. So we can only imagine what would be said otherwise or done. I mean, I think when we think of depravity, we think of a definition that might be in a dictionary that someone who is not capable, someone who is incapable because of actions. But is that the same definition as in this particular statute? Doesn't depravity relate to incarcerations and not necessarily the children, which I think was an argument that counsel had made in his brief. Correct. The case law, in my understanding, does urge the former definition of moral depravity. Our legislature has decided to make a presumption for anybody who has committed three felonies, which then has to be rebutted. If there's no evidence to rebut it, the presumption is going to stand. But in this case, you actually have two domestic batteries after the children were born that removed him from the care. The record isn't entirely clear whether it was the mother, but it was certainly a domestic, which means it was a family member or some household member, two of them. Right. And so obviously that does affect his moral sense and those things, and especially if you actually add that into the fact that he later had an altercation with a corrections officer. So this is not somebody who has in any way shown that he could rehabilitate himself. In addition, the case law, which is a W case, is you have to actually show that you've gotten out of this situation and can function and be a moral person, and that certainly hasn't happened here. Did the respondent have any issues that were identified, mental health issues or things of that nature that were identified as well? I had seen at least one reference. I believe my reflection is that he had schizophrenia, but I don't recall that it didn't come out in this hearing. And while he's in custody, is he receiving, is he going to any classes? Do we know that he's doing classes or anything like that? Well, DCFS would have no ability, or his case workers would have no ability to confirm that if he doesn't sign the releases that they need to sign. But he did appear at a couple of hearings, didn't he? Uh-huh. You could have told them. Do we have anything where he told them he was doing things? I don't know of anything. There was at one point they tried to introduce some certificates that he had maybe done some things. They didn't come out, my recollection, they didn't come out in the termination hearing. But again, I don't know how that's going to rebut any of this. We don't know what it is. It was his job to help present that if that was in fact the case because there was now a presumption of depravity and also a lengthy time where these children had been in limbo and in foster care and being cared for by someone other than him. I just wanted to briefly address my recollection, and since it wasn't briefed or argued, so I'd be happy to follow up if need be. The GAL is typically also the attorney unless it ends up split. I have seen cases where there is a conflict on an older child and they split the attorney and GAL role. But either way, this is a GAL who's advocating for those children, and I do acknowledge that in this case did advocate for termination of parental rights. And I would just point that out. I don't know what procedures are in place. I don't have any way to know what client discussions were had. But if the court is inclined to find a conflict, it would not be anything prior to the appeal. The notice of appeal was filed 30 days after, approximately a little bit before 30 days after the termination orders were in place, and that's when counsel was appointed. So obviously we would ask for anything, if there's going to be anything done about that, that it would be expeditious, since this is an expedited case, in the best interest of the children to move along as quickly and expeditiously as we can. And certainly none of that affects the manifest weight of the evidence. If there's no further questions, I would ask the court to affirm. Thank you. Thank you. Mr. Velli, you may proceed. Thank you. I noticed that your initial brief has Devarius's full surname, and since the children have the same surname, it is not wise to put his surname completely spelled out on the face of the brief. It should have been Devarius and just like the children or in the interest of the children with their initials. So in the future, please don't put anything that will identify the respondent minors or any abused adult. Yes, Your Honor. I apologize for that error. I'll just begin briefly. I would argue that the issues of unfitness were tainted by the fact that Devarius was unable to see his children except for the one visit, in regards to best interest. That, in my opinion, Let me ask you this. What did your client do? I appreciate he's in custody, but what did he do with respect to contact with his children? There was evidence that he had tried to send pictures and letters of both that were ever exchanged. I know there was evidence in the record. I don't know if it was in the trial record, but that one of the foster parents had commented that they were informed or instructed to not allow the children to correspond in writing with Devarius. I think that was corrected. That was early on. So he was, throughout the entire case, through his attorney, and I think the department would agree that he was trying to have contact with his children, and I think Wait a minute. You said you think he sent letters, but you don't know if they were received. By the children. Right. So did he or did he not send letters? He did. He gave letters. If I recall the record correctly, he gave letters to his attorney. His attorney turned over to DCFS. I don't think it was the evidence that the children, whether or not they received the letters or not. And what else did he do besides send letters? Request to see his children pulled over again. But beyond that, that was submitted. I don't know what else he did on being incarcerated, which I understand that he has a lot to do with that. I mean, in the trial record, I think there were a couple of times maybe when he wasn't able to be there or it wasn't transported maybe from Hill. Did his attorney ask that he be able to see his children, or is this something you have determined from your communication with him? Not at this time. I don't believe that the unfitness or the less interest trial, I know for a leader in the proceedings, his attorney himself did request multiple times to allow visits, and I think the court responded that they don't like to have, they don't think it's a good thing for children to be visiting parents in jail. And this was while he was still in Winnebago? Yes. So I don't think the court's opinion changed. And then after that one visit, the decision was made by the department to not allow, I understand they have guardianship, to not allow any more visits. And I just, in my opinion, that I think affects the parent. If they're begging to see their children and they're not able to, I think that affects their will to, particularly while they're incarcerated, to do what they have to do to get their children back. I understand this is, you know, to be incarcerated out of the blue. Well, the issue with incarceration is that the department can't do anything to prevent things, you know, prevent information from getting to them. It can't prevent things that are unreasonable from happening involving the children. And sometimes distance from Winnebago to Hill, Winnebago to Galesburg isn't around the corner. But is there anything that you're saying the department did to prevent him? Other than this concern about the disruptive behavior, not only in that room, but then subsequently when they went back to their foster families? I don't believe it was in the trial record, but I believe in the record itself. There was a comment by one of the foster parents that they were probably thinking that it's not good for the children to be studying various things. Because it was their experience afterwards, when the children came back or something of that nature? I don't think the foster parent elaborated. But he was told not to be involved in it. All right, Mr. Miller, there's one final thing I would like to address that doesn't actually relate to the substance. Yesterday you filed a motion to continue, and we had to deny it because this matter had been set, I think since the middle of December, and now we're about 30 days out from that. If you want an oral argument, ask for it, and we'll do our best to give it to you if time permits, and we don't violate Supreme Court rules. But it's not that we're more important than a trial court, but we don't have the same type of flexibility that a trial court has. If you want an oral argument, we gave it to you, and you don't change it at the last minute. Do you understand that? Yes, Your Honor, and that was our fault. I had it in my calendar at 10.30. I was here at 10, and it was 11.30. We were trying to find it in my calendar. All right. Thank you. Thank you, Your Honor. Was it a motion to continue or a motion to withdraw your request for oral argument? To withdraw the request because I know these are termination proceedings. They're not expected to be continued. Well, two things relative to these are accelerated cases, and when we placed this case on oral argument calendar, it meant that it was delayed. This case could probably have been disposed of at least a month ago had you not placed it on the oral calendar at your request. And secondly, we prepare for these oral arguments, and so I have prepared. In fact, I think the entire panel had prepared for this oral argument before your motion came in. And so when you file a motion within 24 hours asking us to basically toss our research, our individual research, into the can, I think to a certain extent we feel like, no, we spent the time. Your client deserves to be heard. And so if you want oral argument, as Justice Hutchinson said, please request it. But keep in mind that if you do, there will be a delay, and you don't ask for it to be withdrawn a day or two before oral argument is scheduled. Mr. Bell, my point is this, that if you – when you filed your original brief, you sought an oral argument because you thought your client's best interest would be most fully represented if you orally argued that. And then to withdraw it because it became inconvenient. Counsel, frankly, I find that very troubling. I apologize, Your Honor. In fact, it wasn't inconvenience. I just said I didn't – so much that things get set and placed on my calendar that I – you know, I guess I didn't – I know things were already set before this was set, and I have other matters as well. And I – the reason I didn't ask for continuous was because I don't need to expedite it. But I will not do that again. I apologize. Okay. Court's adjourned. Thank you.